UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MINIA MEISELS,

                Plaintiff,

  -against-                                    REPORT AND
                                                         <u>RECOMMENDATION</u>
HENRY MEISELS a/k/a HENICH
MORDECHEI MEISLISH, JOEL MEISELS              19 CV 4767 (RRM)(RML)
a/k/a YOELI MEISLISH, and JACOB
MEISELS,

                Defendants.
  -and-

STAMFORD EQUITIES, LLC, ATERETH
EQUITIES, LLC, OVERLEA EQUITIES, LLC,
4910 EQUITIES, LLC, and NEWLON
EQUITIES LLC,

                Nominal Defendants.
------------------------------------------------------------X

        By order dated January 6, 2020, the Honorable Roslynn R. Mauskopf, Chief United States District Judge, referred this matter to me for a report and recommendation on plaintiff's motion to appoint a receiver, including any motion practice arising out of the issues raised by the parties in relation to that motion. I heard oral argument on April 10, 2020. For the reasons explained below, I respectfully recommend that plaintiff's motion, as well as the cross-motion of defendant Jacob Meisels, be denied.

## PROCEDURAL BACKGROUND AND ALLEGATIONS

        Plaintiff Minia Meisels ("plaintiff" or "Minia"), a British citizen living in Great Britain, commenced this diversity action on August 19, 2019, asserting claims under New York law for appointment of a receiver, injunctive relief, an accounting, breach of fiduciary duty, and

conversion. (See Complaint, dated Aug. 19, 2019 ("Compl."), Dkt. No. 1.) Plaintiff alleges that, together with her late husband, Rabbi Yehoshua Zev Vilmos Meisels ("Vilmos"), who died in London in February 2019, she purchased the five buildings at issue (the "Properties") between 1969 and 1975,[1] and has owned and operated them through a corporate structure since then. (Id. ¶¶ 1, 3) The Properties are residential apartment buildings in Borough Park, Brooklyn, which, according to plaintiff, were purchased in large part with funds that plaintiff and her mother received as World War II reparations from the German government. (Id. ¶ 2.)

Plaintiff contends that, at some point, her late husband arranged for defendants Henry Meisels ("Henry"), their son who lives in upstate New York, and Joel Meisels ("Joel," together with Henry, "defendants"), their grandson who lives in Brooklyn, to manage the Properties.[2] (Id. ¶¶ 2, 15, 16.) According to the complaint, Henry and Joel are now diverting the rents and profits of the Properties away from plaintiff and to themselves, interfering with

---

[1] The Properties are: 5000 15th Avenue; 4910 15th Avenue; 1458 49th Street; 1455 49th Street; and 1450 48th Street. Plaintiff states that, initially, five New York corporations (the "Meisels Companies") held title to the Properties. (Plaintiff's Memorandum of Law, dated Feb. 6, 2020 ("Pl's Mem."), Dkt. No. 35, at 1 n.1.) Plaintiff claims that she and Vilmos jointly owned the corporations. (Declaration of Minia Meisels, sworn to Feb. 6, 2020 ("Minia Decl."), Dkt. No. 36, ¶ 1.) To facilitate a mortgage financing in 2014, the five Meisels Companies transferred title to the Properties to five single-purpose LLCs – Stamford Equities, LLC; Atereth Equities, LLC; Overlea Equities, LLC; 4910 Equities, LLC; and Newlon Equities, LLC (the "LLCs") – of which the Meisels Companies became the sole members. (Pl.'s Mem. at 1 n.1.)

[2] Plaintiff does not say when Henry and Joel were appointed to manage the Properties, although it appears to have happened at least ten years ago. (See Declaration of Joel Meisels, dated Mar. 9, 2020 ("Joel Decl."), Dkt. No. 55-5, ¶ 3 (stating that he has "been largely responsible for management of the Properties since 2010."); Declaration of Henry Meisels, dated Mar. 6, 2020 ("Henry Decl."), Dkt. No. 42, ¶ 13 ("Starting in approximately 2010, when my aunt retired, Joel assumed responsibility for management of the Properties, and ever since, we have collectively managed the business and operations of the Properties.") Plaintiff states only that "[u]nder the supervision of my late husband, various of our family members residing in New York have acted as the officers of the Meisels Companies and/or managers of the Properties from 1969 to the present time. My son Henry and grandson Joel are the latest in a long line of Meisels family members to serve in that role." (Minia Decl. ¶ 3.)

2

plaintiff's access to and control of the Properties, and refusing to provide plaintiff with an accounting. (Id. ¶ 3.)

After her husband's death, plaintiff retained counsel in New York to represent her interests and appointed J. Wasser & Co. to act as managing agent for the Properties. (Id. ¶ 11.) By letter from her counsel dated April 18, 2019, plaintiff informed Henry that he was being replaced as property manager, reminded him that she was claiming one-hundred percent ownership of the LLC interests that owned the Properties, and ordered him to turn over all of the books and records of the Meisels Companies, the LLCs, the Properties, and the other investments he had made at his father's direction. (Id.) Henry refused to cooperate. Instead, he informed plaintiff that he was the owner of the Meisels Companies and declined to provide an accounting with respect to the income and expenses of the Properties or the other investments. (Id. ¶ 12.) In addition, he discontinued the monthly payments that Minia and her other son Jacob Meisels ("Jacob") had been receiving for many years (id.) and allegedly barred plaintiff from access to her own apartment, which she claims she maintains in one of the buildings for when she visits New York.[3] (Declaration of Minia Meisels, sworn to Feb. 6, 2020 ("Minia Decl."), Dkt. No. 36, ¶ 44.) As a result, plaintiff initiated this lawsuit, and on February 6, 2020 moved for the appointment of a receiver to oversee operations of the Properties during the course of this action, to perform an accounting of Henry's and Joel's existing and prior management practices to determine the damages plaintiff has sustained, and to collect all rents received from tenants going forward. (See Motion to Appoint Receiver, dated Feb. 6, 2020, Dkt. No. 34.)

---

[3] Joel denies this characterization of events. He states that "[t]here has long been an apartment at 4910 15th Ave available for management and family use," and although there was a time when the electricity had been turned off, "my grandmother has access to this unit and there is nothing stopping her from staying at the apartment right now." (Joel Decl. ¶ 24.)

3

Also pending is the cross-motion of defendant Jacob, Henry's brother who lives in Israel with his wife, has eleven children,[4] and is the rabbi of an orthodox congregation and the dean of a rabbinical college. (See Declaration of Yaakov Meislish a/k/a/ Jacob Meisels, dated Mar. 8, 2020 ("Jacob Decl."), Dkt. No. 44, ¶ 4.) Jacob seeks "payments to him in the amount of $10,000 per month (according to Jewish calendar) from the proceeds of the Properties" and "arrears of the $10,000 per month (according to the Jewish calendar) that [Henry and Joel] have wrongfully withheld since February 2019." (Memorandum of Law in Support of Motion for Interim Relief, dated Mar. 9, 2020, Dkt. No. 45, at 1.) He states that, for many years, he has received monthly payments from the Properties, which he needs to support his family.[5] (Jacob Decl. ¶ 3.) Jacob explains: "my parents long ago promised me that they would ensure that I would always have money from the Properties to support me and my family. Henry knows this as well." (Id. ¶ 4.) Jacob requests "interim injunctive relief" directing Henry and Joel to continue the monthly payments he claims he had been receiving. He states: "My family and I are truly in dire straits. I cannot wait until the end of this lawsuit for the payments my family and I need to live on to resume." (Id. ¶ 40.)

---

[4] According to defendants, some of Jacob's children are of adult age, employed, and living independently. (Memorandum of Law in Opposition to Jacob's Cross-Motion for Interim Relief, dated Apr. 6, 2020, Dkt. No. 54, at 6.) In fact, in his declaration, Jacob mentions having received $70,000 in 2018 to pay for his daughter's wedding "and setting the couple up in a new home." (Jacob Decl. ¶ 35.)

[5] By Jacob's own admission, he cannot document his receipt of the monthly payments. He states: "The $10,000 was transferred to me by Joel depositing $10,000 in cash with Yosef Zev Grauz ("Grauz") in New York, and Grauz' brother delivering $10,000 in cash to me in Jerusalem. As I needed the money for current living expenses and to pay bills, I never put the money in a bank, so I have no deposit records for it." (Jacob Decl. ¶ 32.) However, Henry and Joel do not dispute that they were sending monthly payments to Jacob until February 2019.

Defendants' objection relies on a document Vilmos signed on January 23, 2017 in a London hospital, while recovering from a heart attack.[6] The document is in Hebrew and the title translates as "Sale Agreement." Among other things, the document purports to sell Vilmos' ownership interest in four of the Properties to Henry and Jacob for $15 million, and to transfer his ownership interest in the fifth Property, 4910 15th Avenue, as a gift.[7] In their Answer, Henry

---

[6] Plaintiff accuses Henry of fraudulently procuring his father's signature on the document. She states:

> On January 23, 2017, 36 hours after my husband came out of his coma in the hospital, my son Henry traveled to London accompanied by two friends (Menachem Mendel Turim and Mordechai Teitelbaum) from his religious community in the Kiryas Joel area of Monroe, New York. While my other children and I were praying to God that Vilmos would recover and live for many more years, Henry approached his father in the coronary care unit in the hospital and thrust in his face a pre-prepared typewritten document in Hebrew called "sale agreement" that he had brought with him. In my presence in the hospital room, Henry told my husband that the document was not intended to effectuate a genuine sale or transfer of title, but rather was a halachic inspired subterfuge to allow Vilmos to leave his interest to me and, upon my death, to all of our children. It was beyond my imagination that Henry would have an ulterior motive while standing at his father's hospital bed.

(Minia Decl. ¶¶ 9-10.) Henry hotly contests this version of events, claiming his father "understood that the purpose of the documents was to transfer interests in the Properties to me" and "[w]e discussed this at the hospital in everyone's presence (where my father sung my praises)." (See Henry Decl. ¶¶ 31-34.)

[7] The document, which is annexed with a certified translation as Exhibit F to plaintiff's affidavit, reads, in pertinent part, as follows:

> The aforesaid first party [Rabbi Vilmos Meisels] is selling to the aforesaid second party [Henry and Jacob] all of his share (i.e., all the parts) that he has in the properties that he has in the country of the United States, which are set out below in [a] letter . . . that is the [sic] annexed to this deed.
>
> * * *
>
> E) It was agreed between the two parties that the payment date of the sale price is thirty days after the first party gives notice in his handwriting to the second party, to give him to [sic] money, or after the lifetime of the first party.

(Continued….)

5

and Joel claim that Henry acquired the Properties from Vilmos by obtaining his interest in the ownership of the Properties through the Sale Agreement. They contend that the Sale Agreement (which defendants refer to as the "Transfer Documents," including the attachments) was "largely prepared by Rabbi Yitzchok Mandel, a renowned Rabbi at a respected Rabbinical Court, based upon conversations that he had with both Vilmos and Henry. . . [and] memorialized a long-time understanding between Henry and his father." (Memorandum of Law in Opposition to Plaintiff's Motion to Appoint a Receiver, dated Mar. 9, 2020 ("Def.'s Mem."), Dkt. No. 37, at 2.) In his Answer, Jacob alleges that the Sale Agreement was never intended to effect a transfer of title to any of the Properties, but was to be used solely for religious purposes to circumvent certain

---

\* \* \*
Annex to the Sale Deed and Agreement (no. 777985)
The following are the properties in the country of the United States that the first party [Rabbi Vilmos Meisels] is selling to the second party [Henry and Jacob]
5000 15th Avenue, Brooklyn N.Y.
1450 48th Street, Brooklyn, N.Y.
1455 49th Street, Brooklyn, N.Y.
1466 49th Street, Brooklyn, N.Y.
All the aforesaid is sold for a price of $15,000,000.00 Fifteen million dollars.

Under the terms of this document, the purchase price of the Properties was deemed to be a loan or debt owed by Henry and Jacob to Vilmos "in such a way that a delay in the payment cannot derogate from the validity from this sale at all." The loan was stated to be payable upon Vilmos' written request or "after his lifetime." The document also states that Henry and Jacob agree not to sell the Properties without their mother's permission, and that "all the management and order of managing the properties with the regard to the sending of money to one country to another will all remain and continue as it was until now as long as one of the parents are still alive." Finally, the document provides for the sale by Vilmos to Henry and Jacob of approximately forty additional properties in the United Kingdom and Israel for eight million pounds, but does not include any payment terms with regard to these properties.
(See Minia Decl., Ex. F.)

inheritance requirements.[8]  (See Answer and Crossclaim of Jacob Meisels, dated Nov. 7, 2019, Dkt. No. 21, ¶ 40.)

Plaintiff contends that she has always been the majority shareholder of the corporate entities that own the Properties, and that her husband did not have the ability to sell more than his minority share.  (Plaintiff's Memorandum of Law, dated Feb. 6, 2020 ("Pl's Mem."), Dkt. No. 35, at 4, 9.)  In addition, plaintiff claims that Henry has not paid any part of the alleged purchase price of $15 million for four of the Properties, and has not honored the requirement in the alleged Sale Agreement that he continue to distribute a portion of the net income to plaintiff.  (Id. at 3.)  Moreover, according to the Sale Agreement, Jacob is also an owner of the Properties; yet he also has not been receiving any monies from the Properties for over a year.  (Jacob Decl. ¶ 22.)

According to plaintiff, Vilmos expressly disavowed the Sale Agreement in a December 2018 sworn statement, after he learned that Henry was claiming ownership of the Properties.  In the statement, he explained that the Properties belonged to him and his wife, Minia Meisels, and that he was too ill in the hospital to ever have transacted a true act of sale.[9]

---

[8]  As Jacob further explains in his declaration: "Henry told my father that it was a traditional Jewish Halachic device that allowed my father to leave his ownership interest in the Properties to my mother for eventual distribution to their children.  Absent an appropriate Halachic document, the oldest son must immediately inherit 40% of a father's estate under traditional Halachic principles of law and the remaining 60% would go to the other sons (thereby leaving nothing to the mother and her daughters). As a result, it is common for a parent to create a document sanctioned by Halacha to avoid the traditional Halachic priority."  (Jacob Decl. ¶ 9.)

[9]  That statement, which is annexed to plaintiff's declaration, reads as follows:

> I the undersigned, Rabbi Yehoshua Zeeve Meislish, hereby confirm that all assets listed below, and in what is called the 'Sale Agreement' and in the annex thereto dated 25 Tevet 5777 [January 23, 2017], according to which I am selling all my assets listed there to my sons Rabbi Mordechai
> (Continued….)

7

Plaintiff also points to a will that Vilmos allegedly executed in August 2018, leaving his entire estate to her.[10]

For their part, defendants claim that "Vilmos, in a written document that he signed 21 months after execution of the Transfer Documents, without any involvement by Henry or Joel, expressly and explicitly ratified the Transfer Documents." (Defs.' Mem. at 3; see also Declaration of Henry Meisels, dated Mar. 6, 2020 ("Henry Decl."), Dkt. No. 55-4, Ex. 7; Declaration of Joel Meisels, dated Mar. 9, 2020 ("Joel Decl."), Dkt. No. 55-5, Ex. 10.) They

---

> [Henry] and Rabbi Yaakov [Jacob], were and are assets that belong to me and my wife, the Rabbanit [Minia], and that apart from the fact that, as is well known, I was then very ill and not in a condition that I was able to do any genuine act of sale, apart from this, my son Rabbi Mordechai [Henry] said then that the aforesaid agreement and annex were only for appearances' sake and to prevent any damage after I reach 120 years. In truth, all the assets listed there and in the annex are our property and are owned solely by us. For the avoidance of doubt, even the fact that the assets were registered in the name of my son Rabbi Mordechai [Henry] did not give him any ownership of those assets.
> These assets were bought by us in the years 5733-5735 [1973-75] and were originally registered in the name of a company called 'off shore' for several reasons, and the management of the assets was done by my late brother Rabbi Shabtai, and after his death by his wife, Rabbanit Mirrel. I entrusted the preparation of the accounts to their son-inlaw, Rabbi Leibi Twersky.
> After that, I transferred the management to my son, Rabbi Mordechai [Henry], in order to give him a livelihood from this. Even the registration in the name of corporations in which he is involved was only done in order that we would be able to obtain a mortgage, which is done far more easily with residents of the United States.

(Minia Decl., Ex. G.) Also attached to plaintiff's declaration are letters from treating physicians at St. Bart's Hospital in London explaining that Vilmos was not medically capable of understanding the Sale Agreement when he signed it. (Id., Ex. H.)

[10] Plaintiff claims that she is the sole beneficiary of Vilmos' Last Will and Testament and succeeds by operation of law to all of his assets. She has submitted a redacted copy of an English translation of the will Vilmos allegedly executed in 2018. (See Reply Declaration of Minia Meisels, dated Mar. 16, 2020, Dkt. No. 50, Ex. A.) However, according to the parties, the will is currently in probate in Israel, where the court has yet to issue any findings concerning the validity or enforceability of the will or the contents of Vilmos' estate.

8

state that this is "consistent with Vilmos' stated desire for Henry to end up with the Properties in light of decades of dedication and sacrifice," and their witnesses attest that "Vilmos was fully aware and in good spirits when he signed the Transfer Documents," and that "no objections were raised by anybody, including Plaintiff and Jacob." (Defs.' Mem. at 3; see also Declaration of Menachem Mendel Turim, dated Mar. 2, 2020, Dkt. No. 40, ¶¶ 9-12; Declaration of Mordechai Teitelbaum, dated Feb. 29, 2020, Dkt. No. 39, ¶¶ 8-11.)

## DISCUSSION

A. Preliminary Injunction Standard

A court may issue a preliminary injunction only where:

> [first,] the plaintiff has demonstrated "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation. . . ." Second, the court may issue the injunction only if the plaintiff has demonstrated "that he is likely to suffer irreparable injury in the absence of an injunction." . . . Third, a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor. Finally, the court must ensure that the "public interest would not be disserved" by the issuance of a preliminary injunction.

Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010) (citations omitted); see also New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015). A preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant carries the burden of persuasion. Int'l Bhd. of Elec. Workers, AFL–CIO v. Charter Commc'ns, Inc., 277 F. Supp. 3d 356, 363 (E.D.N.Y. 2017) (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)). "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999)). "'To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction

9

they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (quoting Freedom Holdings. Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005)). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 510 (2d Cir. 2005).

B. Appointment of a Receiver and other Requested Interim Relief

Plaintiff moves pursuant to Federal Rules of Civil Procedure 65 and 66 for an order:

(1) appointing a temporary Receiver for the protection, possession, control, management and operation of [the Properties] during the pendency of this action, with authority to manage or retain a manager for the Properties, collect and control the income from the Properties, disburse funds to pay expenses, prepare an accounting, and make interim distributions to the parties as directed by the Court; or, in the alternative;

(2) taking appropriate interim measures in the Court's discretion to protect and preserve the income from the Properties pending the resolution of this action, including without limitation appointing an independent property manager for the Properties and requiring monthly accountings of income and expenses to the parties; and

(3) in both events, granting on an expedited basis a preliminary injunction enjoining defendants Henry Meisels and Joel Meisels (a) from diverting or dissipating any assets of the Properties and/or the Meisels Companies pending the outcome of this lawsuit; (b) requiring them to produce to plaintiff all of the books and records of the Properties and the Meisels Companies; and from paying to themselves, or any others acting for or in concert with them, or accepting, any management fee, salary or any other form of compensation or remuneration from the Properties or entities directly or indirectly holding title to the Properties, pending further Order of the Court; (c) to keep and to produce to the Receiver and/or plaintiff accurate records of all income and expenditures in connection with the Properties, whether in cash or otherwise, until further Order of the Court; and (d) to resume and

10

> continue the monthly payments of a portion of the net income of the Properties that plaintiff has received for many years.

(Pl.'s Mem. at 1-2.)

"A federal court has the power in equity to appoint a receiver in order to protect a party's interest in property. . . pending resolution of a dispute over ownership or control between it and another party with a claim to the property." Varsames v. Palazzolo, 96 F. Supp. 2d 361, 365-66 (S.D.N.Y. 2000) (citing FED. R. CIV. P. 66). Factors that courts consider in deciding whether to appoint a receiver include:

> [f]raudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop., LLC, 859 F. Supp. 2d 602, 610 (S.D.N.Y. 2012) (citation omitted). The appointment of a temporary receiver is a drastic and intrusive remedy to be used sparingly and with extreme caution, and while the grant of such an application lies within the court's discretion, the burden is on the moving party to show by clear and convincing evidence that such relief is necessary. See Netsphere, Inc. v. Baron, 703 F.3d 296, 305 (5th Cir. 2012) (appointment of a receiver is "'an extraordinary remedy that should be employed with the utmost caution' and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties.") (citing 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (3d ed. 2012)); Rosen v. Siegel, 106 F.3d 28, 34 (2d Cir. 1997) ("The appointment of a receiver is considered to be an extraordinary remedy, and should be employed cautiously and granted only when clearly

11

necessary to protect plaintiff's interests in the property.") (internal citations omitted); Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314, 316 (8th Cir. 1993) ("A receiver is an extraordinary equitable remedy that is only justified in extreme situations."); In re Oakland Lumber Co., 174 F. 634, 636–37 (2d Cir. 1909) ("[I]n no case should a remedy so far reaching in its effects be resorted to except upon clear and convincing proof.").

Having reviewed the parties' submissions thoroughly and heard oral argument, I find that plaintiff has not met her burden of showing by clear and convincing evidence that she is the legal owner of the Properties, that the Properties are in imminent danger of being "lost, concealed, injured, diminished in value, or squandered," or that she is at risk of irreparable injury. With respect to ownership, "[t]he party seeking a receivership must show that it has some legally recognized right in that property that amounts to more than a mere claim against the defendant involved." SEC v. Republic Nat'l Life Ins. Co., 378 F. Supp. 430, 437 (S.D.N.Y. 1974). Plaintiff acknowledges that she cannot produce a deed or shareholder agreement to support her claim of ownership. (Minia Decl. ¶ 50.) Rather, plaintiff's proof of ownership consists of: (1) her own affidavit and that of Jacob, attesting to the history of the property purchases and the Meisels family's internal, unwritten agreements and understandings; (2) an affidavit from Charles Kaufman, the prior owner of 5000 15th Avenue, in which he recalls dealing with both Minia and Vilmos in selling that property decades ago (id., Ex. D); (3) Certificates of Incorporation for the companies that owned the Properties from the early 1970's (publicly available on ACRIS)— two are signed only by Vilmos, two are signed by Vilmos and Minia (with her name handwritten in next to his typed name), and one (for Newlon Properties

Corp.) is signed only by Minia (Id.);[11] and (4) Vilmos' will, purportedly leaving his entire estate to Minia (Reply Declaration of Minia Meisels, dated Mar. 16, 2020 (" Minia Reply Decl."), Dkt. No. 50, Ex. A). Plaintiff suspects that there may be further documentation of her ownership interest in the basement management office, but claims she has been denied access to the building and to the records. (Minia Decl. ¶¶ 4, 50.)

For their part, Henry and Joel contend that "[t]he historical corporate books (dating back to the period of original acquisition) . . . are largely filled with blank pages and empty forms" and they "know of no documentation regarding original ownership beyond these books and the publicly-available (on ACRIS) Certificates of Incorporation." (Defs.' Mem. at 13; see also Joel Decl. ¶¶ 6-8; Henry Decl.) ¶¶ 9-11.) However, discovery in this case has barely commenced.

On such a sparse and undeveloped record, plaintiff cannot meet her high burden of proving that she has an ownership interest in the Properties. Most of her evidence consists of hearsay, as well as the argument that Henry and Joel do not dispute that Vilmos was the historical owner of the Properties and that he left his entire estate to Minia in his will. But even if the parties did agree on these points (and they do not), they cannot stipulate as to who owns or

---

[11] Plaintiff maintains that there are no shareholders or stock subscribers of record. She cites sections 615 and 601 of the New York Business Corporation Law for the proposition that plaintiff continues to be authorized to adopt by-laws and take action on behalf of three of the corporations (the one on which she is the sole incorporator, and the two on which she and Vilmos were co-incorporators), including with respect to the appointment and removal of officers and employees and the sale or other disposition of the assets of the corporations. If the court were to make a factual finding that the corporations never issued stock certificates or complied with legal requirements to hold annual shareholder meetings or maintain books and records, and that the corporations never sold or transferred any ownership interest in the Properties or the Meisels Companies to any person or entity, plaintiff might succeed on that argument, especially with regard to the one corporation for which she is the sole signatory. However, the court is not prepared to make such findings of fact based solely on the submissions now before it.

13

previously owned the Properties, or who owns the shares in the corporations that are members of the LLCs that own the Properties. Those are issues of fact, which could potentially affect parties not presently before the court. To grant extraordinary interim relief on such a murky record would essentially be to blindly make a ruling on the ultimate issue in the case.

Even if plaintiff could prove conclusively that she is the sole owner of all the Properties and that the Sale Agreement is invalid and unenforceable, she presents little evidence regarding the purported danger to the Properties. Other than plaintiff's disputed allegation that Henry and Joel have defaulted on a loan,[12] plaintiff provides no evidence that the Properties are in jeopardy (tenants underserved, buildings in disrepair or not maintained, rents not collected, fines or penalties assessed, vendors or service-providers going unpaid, etc.) or that Henry and Joel have taken any steps (e.g., disposing of assets, listing the Properties for sale) that require immediate intervention. Plaintiff's main complaint is that Henry and Joel have stopped making payments to her and Jacob, not that the buildings are being mismanaged. The court should only appoint a receiver "upon a clear showing that [an] emergency exists, in order to protect the interests of plaintiff in the property." Meineke Discount Muffler Shops, Inc. v. Noto, 603 F.

---

[12] Plaintiff claims that in December 2019, she received a Notice of Default from a third-party lender, Congregation Khal Yeshaye of Kerestur, which she alleges holds a second mortgage on three of the Properties. (Minia Decl. ¶ 37, Ex. K.) Defendants maintain that, according to documentation retrieved from ACRIS, the private loan is "satisfied and discharged" and is not secured by the Properties, and they stopped paying this loan when "a representative of the lender" failed to "provide clarification and documentation showing that there was still a debt to be paid." (See Joel Decl. ¶¶ 21-22, Ex. 11,) By letter dated January 8, 2020, the president of Congregation Kahal Yeshaye of Kerestur confirmed to plaintiff that the loan was still outstanding and in default. (See Minia Decl., Ex. N.) The letter does not state the amount of the original loan or the amount that remains outstanding; nor does it threaten to foreclose.

Supp. 443, 444-45 (E.D.N.Y. 1985). Plaintiff has not demonstrated anything close to an emergency.[13]

As for irreparable harm, although both Minia and Jacob claim to need the monthly payments for their daily living expenses, neither has provided adequate proof of imminent insolvency or impoverishment. Although the general rule is that a monetary injury does not constitute irreparable harm, there is a narrow exception in situations where a movant can show it is on the verge of insolvency or destitution or will likely suffer serious health consequences. See LaForest v. Former Clean Air Holding Co., 376 F.3d 48, 55 (2d Cir. 2004); Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 250 (2d Cir. 1999); see also Williams v. Blum, 513 F. Supp. 753, 756 (W.D.N.Y. 1981) ("Lack of food to eat and clothes to wear are the quintessential 'irreparable injury.'"). "Before a court will grant relief under this exception, however, the [applicant] 'must show that the risk of insolvency is likely and imminent.'" LG Capital Funding LLC v. Vape Holdings, Inc., No. 16 CV 2217, 2016 WL 3129185, at *4 (E.D.N.Y. June 2, 2016) (citation omitted). "The moving party carries a heavy burden in demonstrating current or imminent insolvency at the preliminary injunction stage, and courts in this Circuit have 'denied applications for a preliminary injunction, even in the face of evidence that a defendant was in very weak financial condition.'" Coastal Inv. Partners, LLC v. DSG Glob., Inc., No. 17 CV 4427, 2017 WL 3605502, at *3 (S.D.N.Y. July 31, 2017) (quoting Union Capital LLC v. Vape Holdings, Inc., No. 16 CV 1343, 2016 WL 8813991, at *3 (S.D.N.Y. Mar.

---

[13] Plaintiff claims that she has "good reason to believe that [Henry] is misappropriating and concealing hundreds of thousands of dollars of income from the Properties." (Minia Decl. ¶ 6.) She provides no evidence to support this assertion or to justify circumventing the discovery process through which the parties will have the opportunity to develop or refute such evidence.

15

9, 2016); and citing LG Capital Funding. LLC v. PositiveID Corp., No. 17 CV 1297, 2017 WL 2556991, at *6 (E.D.N.Y. June 12, 2017); LG Capital Funding, LLC, 2016 WL 3129185, at *4).

While I have no doubt that Minia and Jacob were blindsided by Henry's sudden decision to discontinue their monthly payments, and that they have experienced some hardship as a result, I do not find that they have shown insolvency or poverty rising to the level of irreparable harm. Jacob, as the rabbi of a congregation and the dean of a rabbinical college, earns a salary.[14] Henry and Joel dispute Jacob's depiction of his finances, claiming that they believe Jacob holds real estate in London and Israel. (Memorandum of Law in Opposition to Jacob Meisels' Motion for Interim Relief, dated Apr. 6, 2020, Dkt. No. 54, at 6.) However, absent discovery, they cannot address his representations now. Minia alleges that, until last year, she and her husband received between $20,000 and $30,000 a month from the net income of the Properties, yet she claims she now has no "liquid assets" and "cannot readily pay [her] bills or assist in the support of [her adult] children." (Minia Decl. ¶ 5; Pl.'s Mem. at 14.) She also states that she lives with her daughter and son-in-law. (Minia Reply Decl. ¶ 5.)

At this nascent stage of the litigation, without the ability to conduct a hearing and absent the benefit of discovery, the court cannot make any credibility determinations or evaluate

---

[14] In fact, Jacob states that he and his wife together earn "a little over $4000 per month" (Jacob Decl. ¶ 4), in a country that offers socialized medicine and free public education, and they receive $340 a month "from the government under a welfare program for our children" (id. ¶ 36). I understand that Jacob made decisions in reliance on his belief that the $10,000 monthly payments from the Properties would continue indefinitely, but that is not the same as being in "dire straits."

Moreover, as defendants also point out, Jacob seeks neither monetary relief nor an ownership interest in the Properties through his crossclaims in this litigation. Indeed, Jacob states in his crossclaim and in his declaration that, after the date of the Sale Agreement, he later assigned his interests in the Properties back to his father. (Jacob Decl. ¶ 20.) Therefore, the preliminary injunction he requests would not preserve the relief sought in the crossclaims and cannot be considered "interim."

the validity or enforceability of the Sale Agreement, the will, or the other records submitted by the parties. Nor is it in any position to make findings of fact as to what was in Vilmos' mind when he signed various documents, or indeed what he intended or agreed to at any time during his life. I therefore am constrained to recommend that both plaintiff's and Jacob's motions be denied.[15]

Although I am recommending denial of the motions, I am mindful that this conflict is causing tremendous pain and anguish for all involved. I therefore urge the parties, in the strongest terms, to work to resolve this dispute as quickly as possible.

---

[15] In the alternative to appointing a receiver, plaintiff asks the court to consider fashioning some other interim remedy, such as appointing a special property advisor or independent property manager, requiring monthly accountings and distributions, and enjoining Henry and Joel from diverting or dissipating any assets of the Properties pending the outcome of this lawsuit. (Pl.'s Mem. at 17-19.) Courts have issued such orders where warranted. See, e.g., Republic of the Philippines v. New York Land Co., 852 F.2d 33, 35-37 (2d Cir. 1988) (affirming appointment of a "special property advisor" and injunction against dissipation in case brought against Ferdinand and Imelda Marcos to "preserve the property until the true owner could be determined." The plaintiff had made "a clear, convincing showing of need justifying the appointment of a receiver . . . based primarily on numerous conflicts of interest . . . and the service of mortgage and loan default notices on all of the buildings.") However, I find no legal or factual basis for doing so here. It is undisputed that Henry and Joel have managed the Properties for about a decade, seemingly without complaint. Plaintiff points to nothing that has changed, except the cessation of monthly payments to her and Jacob.

**CONCLUSION**

For the reasons stated above, I respectfully recommend that plaintiff's motion for appointment of a receiver be denied, and that Jacob Meisels' motion for interim relief also be denied. Any objection to this Report and Recommendation must be filed electronically within fourteen (14) days. Failure to file objections in a timely manner may waive a right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(d), 72.

Respectfully submitted,

/s/
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
      May 12, 2020