UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

MINIA MEISELS,

                         Plaintiff,               **MEMORANDUM & ORDER**
                                                     19-CV-4767(EK)(RML)

             -against-

HENRY MEISELS a/k/a HENICH MORDECHEI
MEISLISH, JOEL MEISELS a/k/a YOELI
MEISLISH, et al.,

                       Defendants.

------------------------------------x

ERIC KOMITEE, United States District Judge:

        This action concerns a dispute between family members over five properties in Boro Park, Brooklyn.  Plaintiff Minia Meisels, a British citizen residing in London, brought suit in August 2019 against her son, Henry Meisels, and grandson, Joel Meisels (Henry's son).[1]  Minia alleges that her son Henry has improperly "refused to relinquish management control" of the properties.  Compl. ¶¶ 12-13, ECF No. 1.  Minia's claim is predicated on her assertions that she was a co-owner, together with her husband Vilmos, of the properties from the time of acquisition in the 1960s and 1970s, and that Vilmos left his interest to her when he died in 2019.  Henry, in response, claims to own the properties himself.  Minia now renews her

---

[1] Because the parties share a surname, this order refers to each by their first name.

(previously denied) motion for preliminary injunctive relief pending resolution of the case.  In light of the significantly different posture in which this case now sits, the request for a preliminary injunction is GRANTED IN PART — specifically, it is granted as to four of the five properties at issue, for the reasons set forth below.

## I.   Background

### A.   Factual Background

The operative facts have been set out in prior orders. *E.g.*, Order dated October 16, 2020 Adopting Magistrate Judge Levy's Report and Recommendation 2-4, ECF No. 92; Order dated May 13, 2021, at 3-4, ECF No. 108.  Except where otherwise noted, the facts set out below are based on the evidence provided by both parties in support of, and opposition to, the first motion for preliminary injunctive relief and the present motion.

The parties do not dispute that the Meisels family took ownership of the five Boro Park properties (the "Properties") between 1969 and 1975.  *See, e.g.*, Third Minia Decl. ¶ 4, ECF No. 134; Second Henry Decl. ¶ 8, ECF No. 137. They also appear to agree that very little documentation evidencing the purchase or subsequent transfer of these properties survives.  It is clear that the original purchases were effectuated through five New York corporations that took

title to the Properties.  (The parties refer to these entities as the "Meisels Companies.")  Second Henry Decl. ¶ 8; Third Minia Decl. ¶ 5.  The original ownership of these companies (and by extension, the properties) is the key fact in dispute here. As discussed below, Minia says that she and her late husband established the Meisels Companies and purchased the Properties together.  Third Minia Decl. ¶¶ 4-5.  Henry says Vilmos — not Minia — was "the original and sole owner of the Properties, directly or through the companies that purchased them."  Second Henry Decl. ¶ 8.  But Henry is at best vague (as discussed below) about how he came to possess the properties.

The parties agree that the ownership structure was reorganized in 2014, when the corporations transferred ownership of the Properties to five single-purpose LLCs (the "LLCs").[2] First Minia Decl. ¶ 1 n.1, ECF No. 36.  Each of the five corporations became the sole member of a single LLC, and each LLC took title to a single property.  *Id*.  For ease of reference, the chart below organizes the Properties, the Meisels Companies, and the LLCs that took title in 2014, horizontally:

---

[2] The precise mechanism by which the transfer was effectuated is unclear.  The parties agree that these transfers occurred, and that they did so in 2014.  Third Minia Decl. ¶ 5; Defs.' Mem. in Opp. to Mot. 6, ECF No. 135.

| Boro Park Property[3] | Meisels Company that is Now the Sole Member of the Corresponding LLC | LLC Presently Holding Title |
|---|---|---|
| 4910 15th Ave. | 4910 Realty Corp. | 4910 Equities, LLC |
| 1458 49th St. | Atereth Properties, Inc. | Atereth Equities, LLC |
| 1455 49th St. | Overlea Properties Corp. | Overlea Equities, LLC |
| 5000 15th Ave. | Stamford Realty Corp. f/k/a Stamford Properties Corp. | Stamford Equities, LLC |
| 1450 48th St. | Newlon Properties Corp. | Newlon Equities, LLC |

The family has entrusted management of the Properties to various people over time.  Henry and his son Joel are the most recent managers; Henry began managing the Properties in 1989, and Joel began to help him do so in 2010.  Second Henry Decl. ¶¶ 10-11.  The parties agree that when Henry took on the managerial role, he originally distributed some of the rental income he collected to Minia.  *Id.* ¶ 13; Third Minia Decl. ¶ 6. After Vilmos died in February 2019 these distributions stopped. Third Minia Decl. ¶ 6; *see* First Henry Decl. ¶ 37, ECF No. 42 (confirming that "money has stopped being sent overseas" to Minia).  As a result, on April 18, 2019, Minia delivered a

---

[3] The parties provided letters indicating the property addresses at issue, the LLC that currently holds title to each property, and the Meisels Company that is the sole member of each of those LLCs.  *See* Defs.' Letter dated Sept. 21, 2022, at 1, ECF No. 159; Pl.'s Letter dated Sept. 20, 2022, at 1, ECF No. 158. In these letters both parties agree that the 1458 49th St. property has an alternate address number of 1466.  The same goes for the 1450 48th St. property: it has alternate address numbers of 1442 and 1452.

letter to Henry informing him that she was removing him from his role and installing an outside managing agent "to take over the management of the LLCs and the Properties." *Id.* ¶¶ 7-8.  Henry, through counsel, "refused to cede management control" to Minia's agent and continued to assert his ownership of the Properties. *Id.* ¶¶ 11-12.  At oral argument on March 10, 2021, Henry's counsel acknowledged that Henry has not only failed to share any of the rental income, but also that he has not escrowed the funds at issue.  Oral Arg. Tr. dated March 10, 2021, at 17:22-18:3, 23:9-13, ECF No. 107.

## B.   Procedural Background

At the beginning of the case, Minia moved for a preliminary injunction appointing a receiver to oversee the Properties and for an accounting of Henry's and Joel's management of the Properties.  Pl.'s Notice of Mot. for the Appointment of a Receiver, 1-2, ECF No. 34.[4]  Based on the parties' preliminary submissions, Magistrate Judge Levy recommended that I deny the request, and I concurred.  *See* Order dated October 16, 2020 Adopting Magistrate Judge Levy's Report and Recommendation.  At that early stage, the morass of documentation precluded an immediate finding that either party was likely to succeed on the merits.  Report and Recommendation

---

[4] Page numbers in record citations refer to ECF pagination; page numbers in citations to the briefs refer to internal document pagination.

13, ECF No. 68 ("On such a sparse and undeveloped record, plaintiff cannot meet her high burden of proving that she has an ownership interest in the Properties.").

The defendants, for their part, relied primarily at that stage on a 2017 document — called the Sale Deed and Agreement (the "SD&A") — by which Henry purportedly agreed to purchase four of the properties from his father Vilmos.  SD&A, Ex. 3 at 3, ECF No. 42-3; Attachment to SD&A, Ex. 4 at 3, ECF No. 42-4.  Defendants also claim that Vilmos gave a fifth property (the 4910 15th Avenue property) to Henry as a gift, in a letter signed the same day as the SD&A.  *See* Gift Letter, Ex. 5 at 3, ECF No. 42-5.

Minia later moved for partial judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  ECF No. 73.  That motion asserted that the document on which Henry predicated his claim to ownership — the 2017 SD&A — was void on its face under New York's Statute of Frauds and for lack of consideration because it gave rise to no enforceable right of payment as against Henry.  Pl.'s Mem. in Supp. of Mot. for Partial J. on the Pleadings 16, 24, ECF No. 74.

For reasons explained in my Order dated May 13, 2021, I construed that filing as a motion to strike certain of Defendants' affirmative defenses to the extent they relied on the SD&A.  *See* ECF No. 108, at 19-21, 29.  I then granted the

motion under Rule 12(f), holding that Henry's obligation to pay
for the properties at issue under the SD&A was indeed illusory
and, accordingly, that the document was void for lack of
consideration.  *Id.* at 29.  Familiarity with that ruling in
particular is assumed for purposes of this order, given its
centrality here.

Following my ruling on the SD&A, Minia renewed her
motion for preliminary injunctive relief.  Pl.'s Notice of Mot.,
ECF No. 132.  She requests an order (1) "requiring Defendants
Henry Meisels and Joel Meisels to turn over to Plaintiff or a
managing agent appointed by Plaintiff control and management of
the property and assets" of the five LLCs, including "all
property, books, records, bank accounts, funds and assets . . .
relating to the Properties" and (2) "enjoining Henry Meisels and
Joel Meisels from acting, or holding themselves out to others,
as officers or agents of the Meisels Companies or property
managers with respect to the Properties and from accessing the
bank accounts and other assets of the Meisels Companies and the
Properties."  *Id.* at 1-2.[5]  She asserts that the picture has
clarified significantly — in her favor — with respect to the
parties' respective likelihoods of success on the merits, given
the ruling on the SD&A.  This assertion is correct.  For the

---

[5] Minia requests other forms of relief in the alterative, but because
she is entitled to the primary relief she seeks, I need not consider them.

reasons set forth below, the request for a preliminary injunction is granted as to four of the five properties — all except 4910 15th Avenue, which is the subject of the gift letter rather than the SD&A.

## II.  Legal Standard

A party seeking a preliminary injunction must demonstrate (1) "a likelihood of success on the merits"; (2) "a likelihood of irreparable injury in the absence of an injunction"; (3) "that the balance of hardships tips in the plaintiff's favor"; and (4) "that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).[6] Where a preliminary injunction would alter the status quo, a heightened standard applies: the party seeking it must show "a clear or substantial likelihood of success on the merits." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36-37 (2d Cir. 2018).[7]  Here, Minia's requested relief - that Defendants turn over control of the Properties to her or an

---

[6] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits citations and internal quotation marks.

[7] The Second Circuit has questioned whether the distinction between mandatory and prohibitory injunctions makes sense.  *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985) ("In many instances, this distinction is more semantical than substantive."); *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) ("The distinction between mandatory and prohibitory injunctions is not without ambiguities or critics.").

agent of her choosing – would alter the status quo; thus, I apply the heightened standard.[8]

### III.   Discussion

After considering the evidence and arguments presented, I conclude that Minia has demonstrated a clear and substantial likelihood of success on the merits as to four of the five properties at issue, and satisfied the remaining factors of the applicable standard as well.  Accordingly, I grant certain injunctive relief, as described below.

**A.   Clear or Substantial Likelihood of Success on the Merits**

1.   1458 49th St., 1455 49th St., 5000 15th Ave., and 1450 48th St. Properties

Minia has shown a clear and substantial likelihood of success on the merits as to four of the five properties: that Defendants have unlawfully taken and held possession of property of which she is the rightful owner, excluding her from all rights and privileges of ownership in the process.

---

[8] While the requested relief would disrupt the status quo — in that Defendants were collecting rents prior to the order, and they will not be after it issues — the order is in some ways more prohibitive than mandatory: Defendants will not need to do anything affirmative to comply with it. Instead, they need only cease those aspects of their current course that are inconsistent with the order's terms.  Some of the Second Circuit's language distinguishing prohibitive orders from mandatory could thus be read to support the "prohibitive" label here.  *See, e.g.*, *Tom Doherty Assocs.*, 60 F.3d at 34 ("A mandatory injunction, in contrast, is said to alter the status quo by *commanding some positive act*.") (emphasis added).  Nevertheless, as set forth above, this distinction between prohibitive and mandatory injunctive relief is not dispositive here, as Minia now easily satisfies either standard.

The strongest argument in favor of Minia's position is, at bottom, the near-total absence of any credible competing claim of ownership.  *See Yemini v. Goldberg*, 876 N.Y.S.2d 89, 91 (App. Div. 2009) ("Supporting [movant's] likelihood of success on the merits, there is no evidence in the record to contradict" movant's claim to stock ownership); *see also Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 129 (N.D.N.Y. 2016) (finding substantial likelihood of success on the merits because, among other things, defendants "submitted no evidence rebutting Plaintiff's affidavit and exhibits").  Defendants can point to nothing, *post* my Order declaring the SD&A invalid, apart from Henry's efforts managing the Properties and two oblique documents discussed below.  Unsurprisingly, given this lack of affirmative evidence to support Defendants' position, their opposition papers focus overwhelmingly on attacking Minia's claim to ownership rather than marshaling support for Henry's own claim.  *See generally* Defs.' Mem. in Opp. 9-13, ECF No. 135.

Minia's evidence, by comparison, is much stronger.  It is true that the Meisels family was not good about observing "standard corporate formalities," as Minia acknowledges.  Third Minia Decl. ¶ 5.[9]  But as set forth below, Minia has produced a

---

[9] To note one key example, no party has produced stock certificates for the corporations in the chain of ownership or even suggested that such certificates ever existed.  *See, e.g.*, Decl. of Joel Meisels ¶ 7, ECF No. 41 (declaring that "[a]s far as I know," deeds and shareholder agreements "do

significant quantum of documentary and testimonial evidence supporting her claim to ownership. *See Republic of Philippines v. Marcos*, 806 F.2d 344, 350 (2d Cir. 1986) (affirming grant of injunctive relief where circumstantial evidence of ownership of certain real properties was "strong, if not overwhelming," and "no evidence has been offered to refute it"). Here, with discovery having concluded, *see* Docket Entry dated Nov. 26, 2021, the most credible evidence of ownership is the following:

*Minia's Declarations and Deposition Testimony*. Minia has submitted three separate declarations in the course of this litigation and also sat for a deposition with opposing counsel. *See* First Minia Decl.; Minia Reply Decl., ECF No. 50; Third Minia Decl.; Minia Dep. Tr. Parts I and II, ECF Nos. 143 to 143-1. While she is obviously not a disinterested witness, her recollection is important because she has the most direct knowledge regarding the purchases of the Properties of any living person, and she describes in some detail (and with substantial plausibility) the path by which she came into — and retained — possession.

---

not exist"). But the "mere fact that a corporation did not issue any stock certificates does not preclude a finding that a particular individual has the rights of a shareholder. In the absence of any stock certificate, a court must examine other available evidence to determine the validity of a putative shareholder's claim." *Zwarycz v. Marnia Constr., Inc.*, 15 N.Y.S.3d 86, 87 (App. Div. 2015).

Minia declares that she and her late husband "purchased the properties between 1969 and 1975 with money that my mother and I received from the German government as reparation payments to Holocaust survivors and a small amount of reparations and savings that my husband had set aside."  Third Minia Decl. ¶ 4.  She further declares that pending the administration of Vilmos's estate, she is the owner "in my own right of 80% of the Properties."  *Id.* ¶ 14 n.1; *see also* Minia Dep. Tr. Part I, at 76:11-15 ("80 percent of it was mine and 20 percent was his.").[10]  At her deposition, Minia stated, more generally, that she and Vilmos were partners: "Whatever we owned, we owned jointly."  Minia Dep. Tr. Part II, at 185:8-9. In contrast, Henry is unable to explain plausibly (following the invalidation of the SD&A) how and when he ostensibly came to possess the properties.[11]

*Affidavit of Charles Kaufman.*  Minia has also produced an affidavit from an individual declaring that he sold one of

---

[10] Defendants point out that Minia could not recall what price she paid for the properties.  For example, when asked at her deposition what the purchase price was, Minia replied: "I don't remember.  I don't know."  Minia Dep. Tr. Part I, at 59:9-24.  The inability to recall the purchase price of assets acquired nearly fifty years ago does not, standing alone, undermine Minia's claim to ownership.

[11] Defendants also argue that Minia has offered "conflicting testimony" because she suggested, at one point, that the ownership split between her and Vilmos was 80/20 (in her favor), and at another said they owned the properties "jointly."  Defs.' Mem. in Opp. to Mot. 9-10.  But there is no inconsistency here; Minia's reference to joint ownership does not necessarily imply a 50/50 split.

the properties at issue — 5000 15th Avenue — to her and Vilmos
in the 1970s.  Charles Kaufman met the Meisels at the synagogue
they all attended, where Vilmos's father served as the Rabbi.
Affidavit of Charles Kaufman ("Kaufman Aff.") ¶ 4, ECF No. 36-4.
Kaufman was the sole owner of NOM Realty, which sold the
property to the Meisels' Stamford Properties Corp. entity.  *Id.*
¶¶ 2-6.

Kaufman declares under oath that Minia took the lead
in the purchase negotiations: specifically, that she "ran the
show" and made an all-cash offer "to induce [Kaufman] to sell
the property."  Kaufman Aff. ¶ 5.  Kaufman was "specifically
told" that Stamford Properties Corp., the entity through which
the Meisels effectuated the purchase, was "owned only by the
Meisels."  *Id.* ¶ 6.  After the parties consummated the purchase,
Kaufman stayed on "for about six months" to manage the property;
during that period, he worked "primarily with Mrs. Meisels."
*Id.*

These assertions are substantially probative of
Minia's claim to possession.  *See New York Land Co. v. Republic
of Philippines*, 634 F. Supp. 279, 282 (S.D.N.Y. 1986)
(concluding that actions of purported owners, including taking
meetings about possible purchase of properties in question
"support[ed] an inference of ownership"), *aff'd sub nom.
Republic of Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986).

13

Moreover, Kaufman's affidavit serves to undermine Henry's assertions that Minia never "conduct[ed] any business . . . relating to the Properties," *see* Second Henry Decl. ¶ 9, and that Minia "had absolutely no involvement in the affairs of the Properties whether operational, financial, or otherwise." *Id.* ¶ 14.

*Certificates of Incorporation.* As noted above, the Meisels took ownership of the Properties through five corporations.  Third Minia Decl. ¶ 5; Second Henry Decl. ¶ 8. Minia is identified on three of the five certificates of incorporation filed with the New York Department of State as an "incorporator" of the business, and her signature appears on the documents in that capacity.  For two of these companies — Overlea Properties Corp. and Stamford Properties Corp. — Vilmos signed alongside Minia in the same capacity.  Certificate of Incorporation of Overlea Properties Corp. 5, ECF No. 137-3; Certificate of Incorporation of Stamford Properties Corp. 5, ECF No. 137-4.[12]  For another — Newlon Properties Corp. — Minia served as the sole incorporator.[13]  Certificate of Incorporation of Newlon Properties Corp. 5, ECF No. 137-5.  The certificates of incorporation are not, of course, conclusive evidence of

[12] Overlea and Stamford held ownership of the 1455 49th St. property and the 5000 15th Ave property, respectively.  *See* Vilmos 2011 Letter to Henry, Ex. F to Second Henry Decl. ("Vilmos 2011 Letter") 2, ECF No. 137-6.

[13] Newlon took ownership of the 1450 48th St. property.  *Id.*

ownership, as incorporators often serve a ministerial role in the incorporation process.  *See* James D. Cox & Thomas Lee Hazen, 1 *Treatise on the Law of Corporations*, § 3:8 (3d ed. 2021). Nevertheless, the presence of Minia's signature on these documents tends to undercut — again — Henry's contention that Vilmos exercised full control over the Properties and Minia was uninvolved.  *See, e.g.*, Second Henry Decl. ¶ 9 (Henry states that he cannot "recall [his] mother conducting any business or even discussing business relating to the Properties").

  *Vilmos's 2018 Sworn Statement.*  In December 2018, shortly before Vilmos's death, Vilmos signed a sworn, witnessed statement that Henry misled him into signing the SD&A when he was in the hospital, "very ill and not in a condition" to engage in the transactions at issue.  Vilmos's 2018 Sworn Statement, Ex. G to Pl.'s First Mot. for Injunctive Relief 5, ECF No. 36-7. Vilmos further stated that Henry told him the SD&A was only "for appearances' sake and to prevent any damage" after Vilmos's death.  *Id.*

  Vilmos's take on the SD&A's *validity* is of course irrelevant at this point, given that I have found the "agreement" to be invalid for reasons unrelated to his state of mind.  But the document has evidentiary value here because Vilmos spoke to the original ownership of the properties at issue, reaffirming that the "assets listed there [in the SD&A]"

and in the annex thereto "are assets that belong to me and my wife." *Id*. This statement undermines the defendants' contentions that Vilmos "was the original and sole owner of the Properties." Second Henry Decl. ¶ 8. Though Vilmos is of course unavailable to testify at trial, "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010).

*Vilmos's 2005 and 2018 Wills.* In support of her initial motion for injunctive relief, Minia submitted two wills that Vilmos made (in 2005 and 2018). *See* Ex. A to Minia Reply Decl. ("Wills"), ECF No. 50-1; *see also* Third Minia Decl. ¶ 14 n.1 ("Vilmos made three Wills in the course of his lifetime in which he left 100% of his property and possessions to me."). In the 2018 will, Vilmos leaves "all my property" to Minia. Wills 3. The 2005 will states that "all my assets everywhere which is known to [Minia] or any partnership is equally shared by us, and she well deserves full control on them as she equally helped to build it up the last 50 years." *Id*. at 6.

Vilmos's estate has not been probated, and it remains contested. *See* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. 4, ECF No. 123 (asserting that Minia "will become the owner of all of the Companies after the conclusion of the English probate proceeding"); Defs.' Mem. in Opp. 2 ("Vilmos's estate remains

unprobated, in Israel, the United Kingdom, and the United States.").[14]  And this is not, to be sure, the appropriate proceeding to litigate the validity or enforceability of these wills.  *See Lefkowitz v. Bank of N.Y.*, 528 F.3d 102, 105 (2d Cir. 2007) ("The probate exception is an historical aspect of federal jurisdiction that holds probate matters are excepted from the scope of federal diversity jurisdiction.").  The fact that Vilmos wrote the 2005 will as described above, however, constitutes additional evidence that Vilmos never considered himself the sole owner (contrary to the defendants' suggestion).

Based on all these documents, the evidentiary record points strongly in Minia's favor.[15]

In contrast, Defendants present little to no probative evidence rebutting Minia's showing.  Defendants' argument falls into two broad categories: (1) vague statements about the defendants' "understanding" of the ownership history, without any probative explanation of where that understanding comes

---

[14] *See also* Defs.' Mem. in Opp. 12–13 (describing the proceedings in Israel as "heavily contested" and observing that the United Kingdom proceeding is an open matter, and that no proceedings have been commenced in the United States).

[15] In July 2022, Minia submitted a document that one of her sons had found in his possession (that son is not a party to the litigation).  Letter dated July 6, 2022, ECF No. 153.  The document is a 1985 contract between a former property manager and Vilmos and Minia.  Minia contends that this document supports her claim of ownership because it identifies her as Vice President and Secretary of the Meisels Companies.  *Id*. at 4.  Given that discovery is closed, the motion was fully briefed, and oral argument was held in the case, I have not considered the document in deciding this motion.

from, and (2) evidence that points primarily to Henry's management (rather than ownership) role at the Meisels Companies and the Properties.

In his first two declarations, Henry spoke in extreme generalities about the history of the Properties. *See* Second Henry Decl. ¶ 8 ("My understanding is that my father acquired the Properties during a period in the late 1960's to early 1970's."); *id.* ("I have always understood that my father was the original and sole owner of the Properties . . . ."); First Henry Decl. ¶ 9 ("I have always understood that my father was the original owner of the Properties, directly or through the companies that purchased them."). Joel's declaration echoes that generality. Joel Decl. ¶ 4 ("I have always understood the historical ownership of the Properties to have rested with my grandfather, the late Vilmos Meisels — not my grandmother.").

This lack of foundational knowledge is understandable, given that he was a young child at the time of acquisition and Joel had not been born. *See* First Minia Decl. ¶ 7. ("[Henry] was eight years old when Vilmos and I purchased the first Property."). But it does not save Henry's assertions from irrelevance. *See Asdourian v. Konstantin*, 50 F. Supp. 2d 152, 159 (E.D.N.Y. 1999) (denying preliminary injunction where "[m]uch" of the plaintiff's "proof is based upon information and belief"); *Johnson v. Hunger*, 266 F. Supp. 590, 592 (S.D.N.Y.

18

1967) (denying motion for injunctive relief where it was
"unsupported by affidavit or other proof from a person having
personal knowledge of the facts"); *SEC v. Gen. Sec. Co.*, 216 F.
Supp. 350, 352 (S.D.N.Y. 1963) (declining to credit affidavit
because it was "general to the extreme").  The "quality of the
affidavit will have a significant effect on [the] determination"
of "how much weight [the] affidavit will be given."  11A Charles
A. Wright & Arthur R. Miller, Federal Practice and Procedure §
2949, Westlaw (database updated Apr. 2022) ("Wright & Miller").
Moreover, Henry's statements that he "cannot recall [his] mother
ever holding herself out" as "an owner or co-owner of the
Properties" nor his "mother conducting any business" related to
the Properties, Second Henry Decl. ¶ 9, are entitled to little
weight because they are contradicted by the evidence discussed
above, which shows Minia's substantial involvement in the
acquisition and subsequent control of the Properties.[16]

---

[16] After I held oral argument on Minia's motion for preliminary
injunctive relief on May 26, 2022, Minute Entry, ECF No. 142, the defense
submitted two more declarations from Henry (his third and fourth).  Third
Henry Decl., ECF No. 144-2; Fourth Henry Decl., ECF No. 152.  In both of
these declarations, Henry attempts to fill this gap by explaining, belatedly,
where his "understanding" came from.  He declares that "on numerous
occasions, my father told me clearly that he was the only owner of the five
Boro Park properties . . . and that Minia was not entitled to anything from
them because she was not an owner."  Third Henry Decl. ¶ 2; *see also* Fourth
Henry Decl. ¶ 2 (declaring that he "remember[s] clearly my father telling me
that the amount" Minia received in reparation payments was "between $5,000-
10,000" and that "this amount is plainly not sufficient to support my
mother's ownership claim").  Henry does not specify when or where Vilmos told
him this information.  If anything, however, Henry's newfound recollection
hampers his credibility.  These statements come nearly three years into the
litigation, despite the fact that the importance of this issue was apparent

Beyond these vague assertions, much of the defendants'
opposition relies on evidence of Henry's role as a *manager* of
the Properties and an officer in the Meisels Companies.  *See*
Second Henry Decl. ¶ 10 ("In or about 1989, I began managing the
companies that owned the Properties at my father's request.");
*id.* ¶ 11 ("Starting in approximately 2010, when my aunt retired,
Joel assumed responsibility for management of the Properties,
and ever since, we have collectively managed the business and
operations of the Properties."); *id.* ¶ 18 ("Vilmos . . . not
only appointed my son, Joel, and me as the managers of the
Properties, but also installed me as the President of the
Companies . . . ."); First Henry Decl. ¶ 18 ("I held myself out
as the principal, shareholder, member and the president of the
companies that owned the Properties with my father's full
knowledge and blessing."); Vilmos 2011 Letter to Henry, Ex. F to
Second Henry Decl. ("Vilmos 2011 Letter") 2, ECF No. 137-6
(noting that Henry is "the president of the 5 corporations").

This evidence is beside the point.  It is axiomatic
that corporate management and ownership are different things;
indeed, this is a large part of the point of the corporate form.
*See, e.g.*, *Jana Master Fund, Ltd. v. CNET Networks, Inc.*, 954
A.2d 335, 340 (Del. Ch. 2008) ("At the heart of the corporate

---

all along.  And Henry offers no plausible explanation for the omission or for
his late — and convenient — recall.

form lies the fundamental principle of separation of ownership
and management."); *see also* William M. Fletcher, 5 *Fletcher
Cyclopedia of the Law of Corporations* § 2096.10 (2022)
(observing that the "separation of ownership and control has
been the driving force behind the development of much of the
content of corporate law").

Defendants also rely on a handwritten letter that
Vilmos wrote to Henry in July 2011.  Defs.' Mem. in Opp. 3
(citing Vilmos 2011 Letter 2).  After the salutation "Dear
Henry," Vilmos begins the letter by referring to himself: the
opening clause reads, "As owner of the following 5 buildings in
Boro Park," followed by a colon.  This phrasing is perhaps
notable; Vilmos does not call himself the sole owner or even
refer to himself as "the owner" of the buildings, which might be
read (even weakly) to imply sole ownership.[17]

Following that introduction, the letter speaks to
management responsibility rather than ownership, which (as
already noted) is of limited relevance.  *See supra*.  Vilmos goes
on to list the properties at issue in this case, and describe
the relationship of his son and grandson to those properties: "I
have appointed my above son Henry to be the only manager with

---

[17] The Oxford English Dictionary says the following about the usage of
"the": "Before a noun denoting a thing or person that is unique or considered
to be unique, or of which there is only one at a time (*e.g. the sun, the
earth, the sea . . .*)."  17 *The Oxford English Dictionary* 877 (2d ed. 1989).

21

his son Joel" and that he was "confirming that my son Henry is
the president of the 5 corporations."  *Id*.  The letter's failure
to mention Minia, Defendants argue, evidences Vilmos's sole
ownership of the Properties.  Defs.' Mem. in Opp. 3.

These arguments, too, miss the mark.  There is no
logical reason to think that Vilmos's reference to his own
proprietary rights implies the absence of any co-owners.  And
Minia does not dispute that Henry (and Joel) acted in a
managerial capacity in the past.  If Minia is indeed the owner
of the Properties, she was well within her rights to remove
Henry.

In addition, Defendants rely on a February 3, 2016
email from Vilmos to a third-party, relating to loans and
certain London real estate.  *See* Email of February 3, 2016 from
Vilmos to Richard Kaufman ("2016 Vilmos Email"), ECF No. 137-7.
In that correspondence, Vilmos explains that Henry "will be
sending about £700,000 via *his company* in New York, Stamford
Equities Inc of 4910 15th Avenue."  *Id*. at 2.  Henry cites this
to support his assertion that Vilmos "regularly referred to the
businesses as being mine."  Second Henry Decl. ¶ 17 (emphasis
added).

A lone remark in an email, however, is insufficient to
rebut Minia's much more substantial showing.  Perhaps more
importantly, Henry's argument about this email is inconsistent

with the position he took from the inception of this case:
namely, that he became the rightful owner of the Properties via
the SD&A in January 2017 (almost a full year after this email).
If Henry owned Stamford Equities (and through it, the 5000 15th
Ave. property) in February 2016, then Vilmos could not have sold
that property to Henry in January 2017 (and would have had no
reason to do so).

For these reasons, Minia has successfully established
a clear and substantial likelihood of success on the merits as
to the four properties discussed in this section.  The remaining
property, as discussed in the following section, is situated
differently.

2.   4910 15th Ave. Property

Despite Minia's strong showing as to the above-
mentioned four properties, Minia has not shown a substantial
likelihood of success on her claim to ownership of the 4910 15th
Avenue property (which is held by 4910 Equities LLC).

Defendants contend that this property should be
treated differently because it was transferred to Henry via a
gift letter, rather than the SD&A that has since been
invalidated.  *See* Defs.' Mem. in Opp. 11-12; *see also* Gift
Letter 3.  Vilmos signed the one-page, handwritten gift letter
the same day he signed the SD&A.  The gift letter states: "I

hereby give as an absolute gift, the whole building of 4910 15th Avenue Brooklyn." *Id.*

Minia does not meaningfully grapple with this issue. Indeed, she does not mention the gift letter in her briefs on the instant motion at all. Instead, her motion for injunctive relief generally treats the five properties identically. Some of her evidence, however, applies only to other properties. For example, the incorporation documents for 4910 Realty Corp., the corporation that initially took title to the 4910 15th Ave. property in the 1970s, list only Vilmos as an incorporator. Certificate of Incorporation for 4910 Realty Corp. 5, ECF No. 137-1. Likewise, Vilmos's 2018 statement that the properties purportedly subject to the SD&A "belong to me and my wife" does not implicate 4910 15th Avenue.

While I do not address the validity of the gift letter here, Minia's request for injunctive relief as to the 4910 15th Avenue property is denied. The burden for preliminary injunctive relief is on the movant, as discussed above, and absent a more comprehensive response to the gift letter, Minia has not carried her burden at this stage. *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005) (explaining

that injunctive relief "should not be granted unless the movant, by a clear showing, carries the burden of persuasion").[18]

## B.   Irreparable Harm

Irreparable harm is "a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (per curiam).  It is generally true, as the R&R and the order adopting it indicated, that when a dispute is primarily about money, it is difficult to establish irreparable harm.  *See Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (observing that, on a motion for preliminary injunction, the alleged injury that constitutes irreparable harm "must be one incapable of being fully remedied by monetary damages").

But Minia's first motion for injunctive relief — and the R&R and order adopting the R&R as well — was determined when the case was in a very different posture.  Once it becomes clear, as it has now, that a person with no legitimate ownership

---

[18] None of this is to say that the defendants' arguments about the gift letter are even facially persuasive.  Among other potential problems, Defendants portray the gift letter as reflecting a gift from Vilmos personally.  *See* Oral Arg. Tr. dated May 26, 2022, at 9:24-10:1, ECF No. 144-1 (explaining that "Henry's position is that Vilmos gave an outright gift of the 4910 property to Henry").  But it is undisputed that Vilmos owned no direct interest in the 4910 15th Avenue property (and that direct ownership was instead held by 4910 Realty Corp. through 4910 Equities, LLC).  Defs.' Letter dated Sept. 21, 2022, at 1; Pl.'s Letter dated Sept. 20, 2022, at 1. In addition, the gift letter does not even say to whom this gift is being made — at least not in the translation offered by the defendants.  Gift Letter 3.  This omission is odd, to say the least.

claim is refusing to relinquish control of property, the cases diverge from the general rule about money.  In *Citibank v. Nyland*, for example, the Second Circuit held that a preliminary injunction was proper where the defendant's continuing involvement in the management of real property would cause market confusion as to who was in control of the property.  839 F.2d 93, 97 (2d Cir. 1988).  That, in turn, would likely "harm" the property's "marketability, and, consequently, reduce its value."  *Id.*; *see also Southland Corp. v. Froelich*, 41 F. Supp. 2d 227, 242 (E.D.N.Y. 1999) (holding that "owner's inability to make better use of the site," or "lack of control" of property, constituted irreparable harm).  Other cases have been even more categorical about this principle.  *See, e.g.*, *Tioronda, LLC v. New York*, 386 F. Supp. 2d 342, 350 (S.D.N.Y. 2005) ("The deprivation of an interest in real property constitutes irreparable harm."); *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 367 (S.D.N.Y. 2000) ("Deprivation of an interest in real property constitutes irreparable harm.").

The reasoning of these cases is powerfully applicable here.  As it currently stands, Minia is prevented from making "productive use" of her property.  *Persaud v. Exxon Corp.*, 867 F. Supp. 128, 141 (E.D.N.Y. 1994).  She has demonstrated, at bottom, that Henry and Joel have expropriated her property rights, managed the properties as they saw fit without her

consent or input, and withheld rental proceeds (both before and after the initiation of this litigation).

Defendants attempt to distinguish these cases by changing the subject — namely, by returning to arguments about the merits, rather than meeting the law of irreparable harm head-on. *E.g.*, Defs.' Mem. in Opp. 15 (arguing that in "many of the cases" cited by Plaintiff, the "movant's ownership was undisputed, unlike here"). It is clear that deprivation of a property interest may constitute irreparable harm, and on the facts of this case, Minia has shown she will suffer irreparable harm absent injunctive relief.

## C.   Balance of Hardships

In deciding a motion for preliminary injunctive relief, "a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). That balancing requires evaluating "the severity of the impact on defendant should the temporary injunction be granted and the hardship that would occur to plaintiff if the injunction should be denied." Wright & Miller § 2948.2. The Supreme Court has stated that "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding

of the requested relief." *Winter v. Nat. Res. Def. Council,
Inc.*, 555 U.S. 7, 24 (2008).

    The balance of hardships here is tied up with the
merits; Henry and Joel cannot be harmed by their exclusion from
a property in which they have no credible claim of ownership.
The case law recognizes this link between the merits and the
balance of harms in property cases.  For example, in *WPIX, Inc.
v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012), the Second
Circuit upheld the district court's finding that the plaintiff
was likely to prevail on the merits of its copyright-
infringement claim.  The court then observed, in weighing the
balance of harms, that the defendant could not "complain about
the loss of ability to offer its infringing product." *Id*.  The
defendants here face a similar dynamic.

    The harms Minia faces in the absence of an injunction
are real and practical.  She is prevented from reaping the
rewards of ownership (such as the rental income), improving the
properties, and otherwise making use of them.  As explained
above, her relationship to these properties goes back nearly
five decades.  Minia is now eighty-five years old.  Pl.'s Mem.
in Supp. 7.  Given her superior claim to ownership of the
Properties, she will face substantial harm if she continues to
be unable to structure their ownership and management as she
sees fit.

### D.   Public Interest

Finally, the Court must consider whether the "public interest would not be disserved" by the issuance of an injunction. *Benihana, Inc.*, 784 F.3d at 895. This factor is "another way of inquiring whether there are policy considerations that bear on whether the order should issue." Wright & Miller § 2948.4.

Defendants have not credibly argued that (or how) the public interest would be disserved by the issuance of injunctive relief. On the contrary, the public interest may be served by clarifying ownership. The properties at issue have "approximately 300 units" and "hundreds of tenants." Second Henry Decl. ¶¶ 5, 7. These tenants have a potential interest in knowing the identity of the lawful manager of the buildings.

### E.   Security

The parties do not mention the security requirement of Federal Rule of Civil Procedure 65(c). Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The security requirement "assures the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do

so without further litigation and without regard to the possible insolvency of the plaintiff." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011).

Since "the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond." *Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976).  Where there is "no proof of likelihood of harm" to the non-movant, the court may exercise its discretion to waive the security requirement. *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).  And some courts have likewise declined to impose a security requirement where "the likelihood of [plaintiff's] success on the merits is overwhelming." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 345 (S.D.N.Y. 2010).  For the reasons stated above, Plaintiff has shown a substantial likelihood of success on the merits and Defendants have not shown a likelihood of harm were the injunction entered (or even addressed the issue in a manner that would point to the need for security).  Thus Rule 65(c)'s security requirement is waived.

**F.    Whether an Evidentiary Hearing is Required**

Defendants requested an evidentiary hearing.  Defs.' Letter dated June 2, 2022 at 1, ECF No. 144; *see also* Defs.' Mem. in Opp. 24-25.  An evidentiary hearing is required "where

essential facts are in dispute." *Republic of Philippines v. New York Land Co.*, 852 F.2d 33, 37 (2d Cir. 1988). "An evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case or when the disputed facts are amenable to complete resolution on a paper record." *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998).

When asked at oral argument on this motion what evidence they would offer at a hearing, Defendants indicated they would cross-examine Minia, present Henry as a witness, and perhaps subpoena an accountant for the Meisels family. Oral Arg. Tr. dated May 26, 2022, at 18:24-25, 21:14-16, 40:4-6, ECF No. 144-1. Following argument, Defendants submitted a letter making additional arguments and attaching three new declarations: a new one from Henry (his third), and two from Vilmos and Minia's other children, Hannah Ludmir and Suri Halberstam. Defs.' Letter dated June 2, 2022 at 2, ECF No. 144. Following that submission, I ordered that no hearing was necessary, but that the record would be supplemented to include the new declarations. *See* Order dated June 23, 2022. Henry submitted a fourth declaration after I entered that order.

I have already discussed Henry's third and fourth declarations at length. Ms. Ludmir declares:

> My father explained to me that the money he used to
> purchase the Properties came from a very successful
> transaction he had engaged in with a friend of his,
> Tommy Weiser, in which he sold a large amount of gold
> that had appreciated significantly in value, as well
> as other business transactions.  My father told me he
> used the funds from those transactions to put the
> money down to purchase the Properties, and that the
> funds did not come from Minia but the properties were
> his alone.

Decl. of Hannah Ludmir ¶ 7, ECF No. 144-3.  For her part, Ms.
Halberstam declares that "Vilmos used to tell me that he got the
Properties as a heavenly reward."  Decl. of Suri Halberstam ¶ 9,
ECF No. 144-4.  Halberstam also states Minia was "convinced" by
another daughter and that daughter's husband with whom she lives
(Hinda and Michoel Bieberfeld) to "alienate her children one by
one in order that the Bieberfelds will inherit as much as
possible."  *Id*. ¶ 9.[19]

Such evidence, even if presented credibly, would not
change the outcome here.  Parental alienation is not, of course,
a basis on which to assign ownership of real property.  Ms.
Ludmir does speak to the initial purchase of the properties,
but, *first*, the notion that Vilmos used the proceeds of his
speculation in gold to fund the initial purchases is not

---

[19] Ms. Ludmir states up front in her declaration that she is adverse to
Minia in litigation in the United Kingdom: "Unfortunately, my relationship
with my mother has been strained since I hired a solicitor to object to her
attempt to probate a purported will of my father in the United Kingdom that I
believe to be fraudulent and / or obtained under extreme duress."  Ludmir
Decl. ¶ 4.

inherently inconsistent with Minia's recital; she says the lion's share of the purchase price came from German reparations, but also from a "small amount of savings that my husband had set aside."  Third Minia Decl. ¶ 4.  *Second*, even if 100% of the purchase price came from the "very successful transaction" Ms. Ludmir recalls, the defendants have not explained why the proceeds of that transaction or the properties acquired with those proceeds would not have been marital property.  *See generally Fields v. Fields*, 15 N.Y.3d 158, 165 (2010) (explaining the "well-settled statutory presumption that all property acquired by either spouse during the marriage, unless clearly separate, is deemed marital property").  More generally, it is worth remembering that there is no dispute in this case about where *title* to the properties resides; it resides now in the LLCs formed in 2014, and prior to that it resided in the corporations named above.  The issue is who owns those *entities*, and neither Ms. Ludmir's declaration nor any other new submission speaks to that issue.  Instead, the sisters' declarations suggest (counter to the undisputed facts) that they understood ownership of the real properties at issue to have resided with Vilmos personally.

The existing record provides "an adequate basis for the court's decision," and the information available to the Court on the most significant issue — who is the rightful

controlling owner of the Properties — "would have remained essentially unchanged by any additional evidence" that Defendants intend to offer. *Republic of Philippines*, 852 F.2d at 37 (affirming district court's injunctive relief after it declined to hold evidentiary hearing); *see also Consol. Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 256 (2d Cir. 1989) (affirming district court's grant of injunction without hearing where the "voluminous and comprehensive record in this case provided a more than adequate source for [the district court's] factual findings"), *amended*, 890 F.2d 569 (2d Cir. 1989).

## IV.   Conclusion

For the reasons stated above, Minia's motion is GRANTED IN PART.  Defendants shall, pending these proceedings, cease exercising managerial control over the four residential apartment buildings in the Boro Park section of Brooklyn, New York: 5000 15th Avenue, 1455 49th Street, 1458 49th Street, and 1450 48th Street.  Defendants are further ordered to relinquish all control and management of these properties, as well as the LLCs and corporations that own them (directly and indirectly), to Minia.  The properties shall be managed by a professional property management company, such as the one Minia has previously identified, J. Wasser & Co., or by a comparable managing agent that Minia submits to the Court for approval. Until further order of the Court, Henry and Joel Meisels are

enjoined from acting on behalf of these four real properties,
LLCs and / or corporations.  Defendants are further enjoined
from accessing the bank accounts and other assets of these
entities, or from entering those four properties, without leave
of this Court.  This relief does not apply to 4910 Realty Corp.
(the fifth Meisels Company), 4910 Equities LLC, or the 4910 15th
Avenue property.

        The parties shall appear for a status conference on
October 12 at 2:00 p.m. to discuss next steps in the case,
including Defendants' request for a pre-motion conference in
anticipation of moving for judgment on the pleadings under
Federal Rule of Civil Procedure 12(c).


        SO ORDERED.

                            /s/ Eric Komitee
                            ERIC KOMITEE
                            United States District Judge


Dated:     September 22, 2022
           Brooklyn, New York


35